IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EVA DIAZ and FRANKIE DIAZ | : | CIVIL ACTION |
| as Administrators of the | : | NO. 22-3286 |
| Estate of FRANKIE DIAZ, JR., | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| THE CITY OF PHILADELPHIA, | : | |
| et al., | : | |
| | : | |
| Defendants. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                                        APRIL 20, 2023

## TABLE OF CONTENTS

I.   **INTRODUCTION**.............................................. 2

II.  **BACKGROUND**................................................ 4

III. **LEGAL STANDARD**............................................ 5

IV.  **DISCUSSION**................................................ 6

  A.   **Individual Defendants LaCombe and Carney** ............... 7

   1.  Lack of Personal Knowledge ............................ 8

   2.  Responsibility for Hiring ............................. 9

  B.   **Defendant City of Philadelphia** ........................ 10

   1.  Custom or Policy Claim ............................... 11

   a. Other Inmate-on-Inmate Homicides ..................... 13

   b. City's Policies Affecting Staffing Levels ............ 14

   2.  Deliberate Indifference .............................. 16

   a. Employment policies .................................. 16

   b. Inadequate Staffing Levels ........................... 18

   c. Vacancy Rates ........................................ 21

V.   **CONCLUSION**................................................ 22

I.   **INTRODUCTION**

Plaintiffs Eva and Frankie Diaz, as Administrators of the Estate of Frankie Diaz Junior and under Pennsylvania's Wrongful Death and Survivorship statutes, 42 Pa. Cons. Stat. §§ 8301, 8302, bring claims against Defendants City of Philadelphia, Warden Pierre Lacombe, Prison Commissioner Blanche Carney (in her individual capacity), Corrections Officers ("COs") Nicole Taylor, Denise Wood, and Wanda Britford, and seven unnamed COs under 42 U.S.C. § 1983, as a result of the death of their son at the hands of another inmate, while he was awaiting trial at the Philadelphia Detention Center (PDC). Plaintiffs claim in part that their son's death was the result of the "understaffing" of the PDC by Defendants. Am. Compl., ECF No. 18.[1]

Before the Court is Defendants City of Philadelphia, Warden Pierre LaCombe, and Prison Commissioner Blanche Carney's (collectively, "Moving Defendants") Motion to Dismiss (ECF No. 20) and Plaintiffs' Response in Opposition (ECF No. 24). The CO defendants--Nicole Taylor, Denise Wood, Wanda Britford, and a number of unnamed officers--do not join in the supervisory and municipal defendants' motion to dismiss; rather, they have filed an answer. See ECF No. 28.

---

[1] As the Court previously noted, there is state criminal action against the inmate who allegedly killed Decedent; this matter was initially scheduled for a jury trial on November 28, 2022, but was continued to July 27, 2023. Am. Compl. at 1 n.1.

Moving Defendants argue that Plaintiffs' § 1983 claims for supervisory liability and municipal liability still fail to establish a plausible claim that the City of Philadelphia, Commissioner Carney, or Warden LaCombe, as policymakers for the city, were deliberately indifferent in failing to hire COs or otherwise adequately staff facilities of the Philadelphia Department of Prisons. See Defs.' Mot. 4-5, ECF No. 20. Plaintiffs contend that they only need to allege that the City failed to take reasonable measures to ensure appropriate staffing levels to state a plausible claim for relief and argue that they have satisfied that bar.

Understaffing, in theory, could be the basis for a viable § 1983 claim: knowledge of a custom of understaffing and the pattern of harm that results to inmates and COs when prisons are understaffed puts the City on notice that a failure to act under certain circumstances could result in constitutional violations. However, Plaintiffs have not pleaded sufficient facts to support a claim that there was a custom of understaffing in place at the time of Decedent's death, nor sufficient facts to give rise to a plausible claim that the City was deliberately indifferent in failing to achieve proper staffing levels. Accordingly, the motion to dismiss will be granted.

**II.  BACKGROUND[2]**

The Court previously recounted the facts of this case in detail, and thus does not repeat those facts alleged in the original complaint in full here. See Diaz v. City of Philadelphia, No. 22-3286, 2022 WL 16553385 (E.D. Pa. Oct. 31, 2022). Broadly, Plaintiffs allege that their son, Frankie Jr. ("Decedent"), was beaten to death while detained prior to trial in the Philadelphia Detention Center. Plaintiffs claim that Defendants knew of obvious risks to Decedent and failed to protect him from harm, given Decedent's "several fights and disagreements" with, and threats from, certain other inmates on his cell block. Plaintiffs further argue that the understaffing of the Philadelphia Detention Center was a legal cause for his death.

Plaintiffs allege that the Philadelphia Department of Prisons "has displayed a consistent and systemic failure to maintain proper staffing practices . . . leading to an increase in inmate deaths directly related to the lack of supervision." Am. Compl. ¶ 67, ECF No. 18. Plaintiffs allege that Defendants were on notice of systemic staffing issues, as Commissioner Carney has described shortages caused by COVID-19 and City

---

[2] The facts recited are drawn from the Plaintiffs' amended complaint, ECF No. 18, and taken as true. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007).

Controller Rhynhart has acknowledged the unsafe conditions for workers and inmates. Id. ¶¶ 71, 76.

Plaintiffs continue to point to lawsuits filed against the City on the basis of understaffing and dangerous living conditions in municipal detention centers. Id. ¶¶ 86-98. Plaintiffs allege that, despite being ordered in another case to increase staffing levels, "the City has maintained a pattern and practice of continuing to understaff their facilities, including the Detention Center." Id. ¶ 92. Plaintiffs further recount the statements and histories of inmates detained in Philadelphia Detention Centers between September 2020 and September 2021, detailing injuries and deaths that were allegedly not attended to promptly enough by COs. Id. ¶¶ 113-152.

### III. LEGAL STANDARD

The party moving for dismissal under Rule 12(b)(6) bears the burden of showing that the opposing party has not stated a claim. See Kehr Packages v. Fidelcor, Inc., 926 F.3d 1406, 1409 (3d Cir. 1991). To meet this burden, a moving party must show that the complaint does not contain "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

A plaintiff need not make out a prima facie case in the complaint in order to survive a motion to dismiss, however. Connelly v. Lane Construction Corp, 809 F.3d 780, 788-89 (3d Cir. 2016) (distinguishing between pleading requirements and evidentiary standards); Fowler v. UPMC Shadyside, 578 F.3d 203, 213 (3d Cir. 2009) ("[A]n evidentiary standard is not a proper measure of whether a complaint fails to state a claim."). But, while a plaintiff need not have the correct legal theory or make out a prima facie case in the complaint, a plaintiff must allege facts to show that discovery will reveal sufficient support of each element of the claim. Cf. Comcast Corp v. NAACP, 140 S. Ct. 1009, 1014-15 (2020) ("[W]hile the materials the plaintiff can rely on to show causation may change as a lawsuit progresses from filing to judgment, the burden itself remains constant.").

At this stage, the Court must accept Plaintiffs' factual allegations as true, and draw all reasonable inferences in their favor. Bell Atl. Corp., 550 U.S. at 555-56. But, the Court must disregard any conclusory allegations in the complaint and instead look to the well-pleaded factual allegations. Iqbal, 556 U.S. at 678-79.

## IV.  DISCUSSION

Plaintiffs bring their federal claims under § 1983 for violations of Decedent's rights under the Fourteenth Amendment as a pretrial detainee subjected to allegedly unconstitutional

conditions. See Bell v. Wolfish, 441 U.S. 520, 535 (1979)
(attributing the constitutional protections for state pretrial
detainees against unlawful punishment to the Due Process Clause
of the Fourteenth Amendment); Hubbard v. Taylor, 399 F.3d 150,
163-68 (3d Cir. 2005) (discussing the applicability of the
Fourteenth Amendment to pretrial detainees under Bell v.
Wolfish). Defendants do not contest that Defendants are
"person[s] [acting] under color of any statute, ordinance,
regulation, custom, or usage," of the Commonwealth of
Pennsylvania. 42 U.S.C. § 1983. Rather, Defendants argue that
Plaintiffs' claims fail on the merits.

### A.   Individual Defendants LaCombe and Carney

To make out a § 1983 claim against an individual municipal
officer, a plaintiff must show that "the official violated a
statutory or constitutional right that was clearly established
at the time of the challenged conduct." Carroll v. Carman, 574
U.S. 13, 16 (2014) (per curiam) (citation omitted). Federal
courts have recognized that prison officials have a duty to
protect inmates. See, e.g., Farmer v. Brennan, 511 U.S. 825
(1994) (requiring a showing of substantial risk of harm to an
inmate, subjective knowledge of the risk on the part of the
officers, and deliberate indifference of that risk, in order to
support a § 1983 claim for failure to protect).

As to the claims against the individual defendants, Plaintiffs describe Defendants' failures as:

> a. Failing to maintain appropriate staff in the inmate housing units;
> b. Placing Frankie Diaz in a cell with inmate Adam Tann despite knowledge of prior threats and/or assaults;
> c. Failing to have a corrections officer in the shower area while inmates were showering particularly those with a violent history such as Mr. Tann;
> . . .
> f. Failing to adequately protect Frankie Diaz from fatal injuries while in their custody and control;
> g. Failure to have a sufficient number of guards in the shower area;
> . . . and
> l. Willfully subjecting Frankie Diaz to an assault and ultimately his death, described herein.

Am. Compl. ¶ 170.

### 1. Lack of Personal Knowledge

Plaintiffs allege that Defendant Lacombe was "responsible for the assignments, staffing, and operations of" the Detention Center. Am. Compl. ¶ 11. Plaintiffs allege that Defendant Carney was "the final policymaker on correctional officer staffing levels within the Philadelphia Department of Prisons including at the Detention Center." Id. ¶ 12. Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution. Ashcroft, 556 U.S. at 676.

Although Plaintiffs allege that these Defendants generally had some supervisory and managerial responsibility, they have

not sufficiently alleged that these Defendants themselves acted in an unconstitutional manner. For instance, Plaintiffs have not alleged that Warden LaCombe knew of the risk to Decedent's health or safety and acted with deliberate indifference in "continu[ing] to place Diaz on the prison block which was substantially understaffed." Am. Compl. ¶ 26.

As to Defendant Carney, Plaintiffs merely allege that Commissioner Carney was aware of the understaffing problem and of injuries to inmates. See Am. Compl. ¶¶ 68, 69, 76, 85, 91, 108. Again, Plaintiffs must allege some facts other than Defendant Carney's knowledge of a general understaffing problem in order to state a constitutional violation.

### 2.   Responsibility for Hiring

Moreover, it is also not alleged that either Warden LaCombe or Commissioner Carney were responsible for hiring COs or otherwise working to recruit or retain COs. Rather, in the very newspaper article that Plaintiffs cite in paragraph 72 of the amended complaint, Controller Rynhart--quoted as saying the opposite--indicates that Mayor Kenney, rather than the named Individual Defendants in this case, has the ultimate hiring power and responsibility.

Accordingly, Plaintiffs have not alleged sufficient facts to state a § 1983 claim against Defendants LaCombe and Carney.

These claims comprising Count I of the amended complaint will be
dismissed.

### B. **Defendant City of Philadelphia**

To survive the pleading stage in a § 1983 claim against the
City, Plaintiffs must allege that (1) a constitutionally
protected right was violated and (2) the alleged violation
resulted from a municipal policy or custom that exhibits
deliberate indifference to rights of citizens. Monell v. Dep't
Soc. Servs. of City of New York, 436 U.S. 658, 694–95 (1978).
The City cannot be liable under § 1983 on a theory of respondeat
superior. Id. at 691.

As the Court previously explained, see Diaz, 2022 WL
16553385, at *4-5, there are two general ways that a plaintiff
can raise a § 1983 claim against a municipality: (1) that an
unconstitutional policy or custom caused their injuries, or, (2)
that the plaintiff's injuries "were caused by a failure or
inadequacy by the municipality that 'reflects a deliberate or
conscious choice.'" Forrest v. Parry, 930 F.3d 93, 105 (3d Cir.
2019) (quoting Monell, 436 U.S. at 694). A custom or policy does
not require a plaintiff to "demonstrate an unconstitutional
policy or custom of, or amounting to, deliberate indifference";
however, a failure or inadequacy claim does require such a
showing. Forrest, 930 F.3d at 107.

1. <u>Custom or Policy Claim</u>

When bringing a custom or policy claim, a plaintiff must "identify the challenged policy, attribute it to the city itself, and show a causal link between the execution of the policy and the injury suffered." <u>Losch v. Borough of Parkesburg, Pennsylvania</u>, 736 F.2d 903, 910 (3d Cir. 1984); <u>Forrest</u>, 930 F.3d at 105 ("[A] plaintiff presenting an unconstitutional policy must point to an official proclamation, policy or edict by a decisionmaker possessing final authority to establish municipal policy on the relevant subject. And, if alleging a custom, the plaintiff must evince a given course of conduct so well-settled and permanent as to virtually constitute law." (citing <u>Monell</u>, 436 U.S. at 798)).

To allege a custom, a plaintiff typically must demonstrate that there was a pattern of similar constitutional violations. See <u>Connick v. Thompson</u>, 563 U.S. 51, 54 (2011) (holding that a municipal division could not be held liable under § 1983 for failure to train based on a single constitutional violation). Further, a custom claim "requires proof of knowledge and acquiescence by the decisionmaker." <u>McTernan v. City of York, Pennsylvania</u>, 564 F.3d 636, 658 (3d Cir. 2009). Acquiescence may be inferred where a plaintiff alleges that "policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this

11

failure, at least in part, led to their injury." <u>Bielevicz v. Dubinon</u>, 915 F.2d 845, 851 (3d Cir. 1990).

To allege that the challenged custom or policy was the cause of the deprivation of constitutional rights, a plaintiff must at least show that "occurrence of the specific violation was made reasonably probable by permitted continuation of the custom." <u>Id.</u> (quoting <u>Spell v. McDaniel</u>, 824 F.2d 1380, 1391 (4th Cir.1987)). Because a municipality cannot be vicariously liable for the actions of the individual officers, a plaintiff must allege sufficient facts to show that the municipality's custom or policy, independent of the actions of the individual officers, was a legal cause of the harm. <u>See</u> <u>Anderson v. City of Atlanta</u>, 778 F.2d 678, 686 (11th Cir. 1985); <u>see also</u> <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 391 (1989) (directing the factfinder to consider, as a part of the causation inquiry, whether the injury would have been avoided if the policy at issue were changed).

Here, Plaintiffs argue that, because there is "understaffing" of Philadelphia prisons, inmates have been harmed, and the City is aware of both the "understaffing" and the risk of harm to inmates. According to Plaintiffs, the fact that the City has not hired more COs to fill a large number of vacancies must mean that the City has adhered to a course of conduct or has otherwise adopted some unofficial policy.

12

a. Other Inmate-on-Inmate Homicides

In support of this claim of custom, Plaintiffs cite a report from the City Controller's office, released on July 1, 2021, which generally discusses the increase in staff vacancies in Philadelphia prisons, from 2019 to 2021.[3] Am. Compl. ¶ 70, ECF No. 18. Plaintiffs allege, on the basis of the report, that there were five inmate-on-inmate homicides between August 2020 and May 2021 (including the death in this case), which exceeded the total number of inmate-on-inmate homicides in the prior eight years combined.[4] Id. ¶ 73. These tragic events alone, however, do not give rise to an inference that, at the time of Decedent's death in August of 2020, there was an unofficial custom of understaffing prisons which was certain to result in constitutional violations.

Even viewing the four other inmate-on-inmate homicides in the light most favorable to Plaintiffs--given that the four other homicides cited in the City Controller's report occurred after Decedent's death in the instant case, all occurred at the Curran Fromhold Correctional Facility (CFCF) and not at PDC, where Decedent was housed, and occurred under different

---

[3] The number of unfilled CO positions, according to the City's Post Plan (the approved policy regarding staff deployment), the number of vacancies tripled from 2019 to 2021. Decedent was pronounced dead on August 19, 2020. Am. Compl. ¶ 64, ECF No. 18.

[4] According to the report, there was one inmate-on-inmate homicide in each of the years 2015, 2017, and 2018.

circumstances,[5] whether singly or jointly--Plaintiffs fail to establish the alleged understaffing at the PDC "was the <u>moving force</u> behind the resulting injury." <u>Thomas v. Cook Cnty. Sheriff's Dep't</u>, 604 F.3d 293, 307 (7th Cir. 2010). Plaintiffs thus have failed to allege sufficient facts to connect Decedent's death to the subsequent deaths of other inmates to establish that custom or policy of understaffing was a legal cause of injury to Decedent.[6]

> b. <u>City's Policies Affecting Staffing Levels</u>

Plaintiffs also allege that certain City policies enacted in 2004 affected staffing levels in the Philadelphia Department of Prisons. However, Plaintiffs do not allege sufficient facts to show, for instance, that (1) that such policies did in fact

---

[5] The first other inmate was killed on January 15, 2021. He was apparently killed by his cellmate, by means of blunt impact head trauma. <u>Id.</u> ¶¶ 125-26. This inmate was incarcerated at the CFCF. The second other inmate was killed on March 18, 2021, while he was exiting the prison grounds at CFCF after being released. <u>See id.</u> ¶ 136 n.18. The third other inmate was killed on March 27, 2021. This inmate was killed after being sexually assaulted by a cellmate. That cellmate had previously raped another inmate. This incident also occurred at CFCF. The fourth other inmate, a pretrial detainee for a minor drug offense, died in the hospital on April 25, 2021, after being assaulted by his cellmate. <u>See id.</u> ¶¶ 128-133. "The cellmate had a long record of random assaults and violent criminal offenses, most of which appeared unprovoked." <u>Id.</u> ¶ 133. He was also in custody at CFCF.

[6] Plaintiffs do not differentiate as to the extent of the alleged understaffing among the various facilities operated by the City of Philadelphia. Plaintiffs also do not identify the extent to which the PDC in particular was understaffed during this period.

result in a reduction in staffing levels; (2) that staffing levels have consistently been too low for any period of time since then; (3) that the City has been on notice of low staffing levels since 2004, or any time prior to Decedent's death; (4) that the City has been aware since 2004 or any time prior to Decedent's death that inmates may be deprived of their constitutional rights if there are not enough COs; or (5) that prior to Decedent's death, the City failed to take reasonable measures to achieve proper staffing levels. Plaintiffs instead focus on staffing levels and prison conditions in the time period <u>after</u> Decedent's death. <u>Id.</u> ¶¶ 74-85.

Because Plaintiffs do not supply sufficient facts as to the staffing levels before or at the time of Decedent's death, the Court cannot determine how long the City has been on notice of the constitutional violations that may arise when prisons are understaffed. Plaintiffs repeatedly cite to the <u>Remick</u> litigation to show that the City is on notice of potential constitutional violations.[7] However, the <u>Remick</u> litigation itself

---

[7] <u>Remick v. City of Philadelphia</u> was a class action brought by persons incarcerated in the Philadelphia Department of Prisons' facilities in April 2020, regarding prison conditions during the COVID-19 pandemic. <u>See</u> <u>Remick v. City of Philadelphia</u>, No. 20-1959, 2022 WL 742707 (E.D. Pa. Mar. 11, 2022) (Schiller, J.). After the class was certified, the case settled.

 Under the terms of the Settlement Agreement, the City will: (1) implement measures to enhance the hiring and retention of correctional officers, including by issuing signing and retention bonuses; (2) provide

was commenced only a short time (four months) before Decedent's
death, and staff shortages had not yet been raised in that
litigation.[8] Therefore, even assuming understaffing, the <u>Remick</u>
litigation had not progressed sufficiently to put the City on
notice of the risk of harm to inmates due to the understaffing.

### 2.   Deliberate Indifference

#### a. Employment policies

Nor have Plaintiffs alleged that the failure to hire was
the result of deliberate indifference. <u>See</u> <u>McDowell v. Brown</u>,

---

incarcerated persons with greater amounts of out-of-
cell time on a schedule with graduated increases; (3)
increase capacity for in-person visits and develop a
plan for return to pre-pandemic programming; (4)
continue to ensure adequate and timely medical and
mental health treatment, including by expanding mental
health programming and reducing backlogs for medical
appointments; (5) ensure compliance with individuals'
due process rights during disciplinary proceedings;
(6) expand phone and tablet access; (7) continue the
implementation of a lock replacement program and
implement refresher training on the emergency call
button system; (8) continue to follow COVID-19-related
protocols to ensure incarcerated persons are available
for court and meetings with attorneys, including by
testing incarcerated persons before court appearances;
and (9) provide refresher training on the PDP's use of
force policy.

<u>Remick v. City of Philadelphia</u>, No. 20-1959, 2022 WL
2703601, at *2 (E.D. Pa. July 12, 2022).

[8] At the time Decedent was killed, a partial settlement agreement
had been approved in response to the class action plaintiffs'
motion for a preliminary injunction and temporary restraining
order. The agreement contained provisions pertaining to
cleanliness and hygiene in light of the COVID-19 emergency and
the rising rates of infection throughout PDP facilities.

392 F.3d 1283, 1291 (11th Cir. 2004) ("[Plaintiff] cannot rely on a generalized policy of understaffing. The [Defendant] County must have a 'deliberate intent' to inadequately staff the [jail]." (citation omitted)).

Plaintiffs have simply alleged that certain employment policies enacted by the City have made the job of CO less desirable. See Am. Compl. ¶ 87 ("On November 4, 2004, then-Commissioner Leon King implemented a limited overtime policy for PDP officers, sparking significant under-staffing."). But Plaintiffs do not assert any well-pleaded allegations that the City intentionally and with deliberate indifference has enacted policies that have disincentivized employee hiring or retention.[9]

---

[9] Plaintiffs add some claims to the amended complaint in support of their Monell claim; however, these new allegations are wholly conclusory:

176.  The Plaintiff's claims are not based upon individual decisions of individual corrections employees to show up for work or not, but rather the decisions of Commissioner Blanche Carney, Warden Pierre LaComb[e], and the policy makers in the City of Philadelphia who were deliberately indifferent to the constitutional rights of pre-trial detainees under the Fourteenth Amendment.

177.  This course of conduct is so well settled and permanent as to constitute a law.

178.  For example, as set forth above there are just numerous extensive examples of actual statements of inmates who have felt unsafe, in danger, have been actually injured, and even killed as a result of the lack of sufficient staff to protect pre-trial detainees as required under the Fourteenth Amendment.

. . . .

See, e.g., Taylor v. Armor Corr. Health Servs., Inc., No. 20-
1406, 2021 WL 4556213, at *17 (D. Colo. July 21, 2021)
(comparing cases in which plaintiffs did and did not plead
sufficient facts to support a policy or practice claim for
deficient prison medical care under Monell).

> b.   Inadequate Staffing Levels

Plaintiffs also allege that "for years, the Philadelphia
Department of Prisons has displayed a consistent and systemic
failure to maintain proper staffing practices." Am. Compl. ¶ 67.

---

> 180.  Despite knowledge of staffing shortages, the
>       Defendant City of Philadelphia failed to even
>       attempt to hire, put in place reasonable plans for
>       hiring, sufficient numbers of corrections officers
>       to meet and provide the constitutional rights of
>       detainees in their custody.
>
> . . . .
>
> 188.  The decisions to rely upon overtime, and not hire
>       sufficient guards, and allow pervasive, customary,
>       and dangerous levels of understaffing to occur
>       within the prison system were made by the Defendant
>       in willful disregard and deliberate indifference to
>       these constitutional rights.
>
> . . . .
>
> 190.  Policymakers and authoritative figures knew of the
>       failures of the Philadelphia Department of Prisons
>       as discussed herein but failed to take the
>       necessary steps to rectify the failures, including
>       but not limited to the significant understaffing of
>       the prisons (including Detention Center) and
>       adequately protect the constitutional rights of the
>       inmates in their custody and control.

Am. Compl. ¶¶ 176-78, 180, 188, 190.

The Court thus considers whether a "failure to act" claim against the City has been sufficiently alleged in the amended complaint. At least in the failure to train context,

> if a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action--the "deliberate indifference"-- necessary to trigger municipal liability.

Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 407 (1997) (citing Canton v. Harris, 489 U.S. 388, 390 n.10 (1989)). In this context, "[t]o prove deliberate indifference, [a plaintiff] need[s] to show that [a defendant] was on notice that, absent additional specialized training, it was . . . . so predictable that failing to train [the municipal employees] amounted to conscious disregard for" the constitutional rights of citizens. Connick, 563 U.S. at 71.

Even assuming that this failure to train standard could be equally applied in the insufficient hiring context, and that Plaintiffs have sufficiently alleged that it is highly predictable that understaffing will lead to violations of inmates' constitutional rights, Plaintiffs have not alleged sufficient facts to show that Defendants have not made adequate efforts to change the "program" and achieve higher levels of

staffing.[10] <u>See, e.g.,</u> <u>Brown</u>, 520 U.S. at 407. Plaintiffs ask the
Court to find that "[a]ll a plaintiff needs to allege is that
the policymaker (or the municipality) 1.) knew of the risk and
2.) failed to take reasonable steps to alleviate it." Pls.'
Resp. in Opp'n at 14 (citing <u>Tafoya v. Salazar</u>, 516 F.3d 912,
916 (10th Cir. 2008)). But Plaintiffs must provide more than
conclusory allegations that the City failed to take measures to
increase staffing levels, and such action or inaction was the
byproduct of deliberate indifference. <u>E.g.,</u> <u>Estate of Roman v.
City of Newark</u>, 914 F.3d 789, 798 (3d Cir. 2019).

It is true that a showing of "acquiescence in a
longstanding practice or custom which constitutes the 'standard
operating procedure' of the local governmental entity" may also
support a custom or policy claim. <u>Jett v. Dallas Indep. Sch.
Dist.</u>, 491 U.S. 701, 737 (1989) (quoting <u>Pembaur v. Cincinnati</u>,
475 U.S. 469, 485-87 (1986) (White, J., concurring)). Again,
Plaintiffs have not alleged that Defendants have "acquiesced" or
"given up" on hiring sufficient COs to correct the
understaffing.[11] Rather, that numerous City officials have

---

[10] Although Plaintiffs cite the <u>Remick</u> Monitor's reports, which
do indicate that the City has not made any appreciable progress
in hiring more COs since the settlement agreement was approved
in July 2022, such information is not probative of the City's
alleged deliberate indifference at or about the date that
Plaintiff's son as killed, August 18, 2020.
[11] Plaintiffs allege throughout that having the equivalent of
"more hands on deck" would prevent violations of inmates'

commented that the prisons remain understaffed, also suggests
the opposite: that City officials recognize the problem and are
attempting to find a way to hire and retain more COs under the
present difficult circumstances.[12]

c.   Vacancy Rates

Finally, Plaintiffs compare the vacancy rate in the
Philadelphia Department of Prisons (28%) to that of the
Pennsylvania Department of Corrections (5.6%) to support their

---

constitutional rights like those alleged in the amended
complaint. Whether having "more hands on deck" would result in
fewer constitutional violations is not clear; the amended
complaint does not suggest how, if implemented, having
additional COs on duty would prevent constitutional violations,
especially where the facts alleged in the amended complaint show
that CFCF, and not the PDC, has been the source of the majority
of the purported constitutional harms.

[12] One of the articles that Plaintiff cites notes:

The administration responded to the report, as well
as calls from other elected officials and the
Pennsylvania Prison Society, by saying it was doing
everything it could, and new classes would be graduating
over the next few months.
Yet, despite the administration's promises, the
problem has only gotten worse. Correctional officers,
sergeants, lieutenants, captains, and even wardens
continue to resign as conditions deteriorate further. As
of Sept. 23, prison staffing remained 500 officers below
where it needs to be to operate safely.

Rebecca Rhynhart, Philly's Shockingly Inhumane Prison
Conditions, Phila. Inquirer (Oct. 6, 2021),
https://www.inquirer.com/opinion/commentary/philadelphia-
prisons-correctional-officer-shortage-20211006.html. So, it
appears that the City is not failing to hire officers at all.
The issue may, more likely, pertain to retaining officers.

claim that it is a custom of the City of Philadelphia to fail to hire or be deliberately indifferent to the need to hire sufficient COs. <u>See</u> Am. Compl. ¶¶ 84, 85. But, this comparison alone, is not persuasive: Plaintiffs do not address the many variables across Pennsylvania that may affect one county's greater ability to hire and retain COs over another.

Accordingly, making all inferences in Plaintiffs' favor and taking all facts alleged as true, Plaintiffs have not pled sufficient facts to show that discovery could lead them to state a claim for municipal liability on a custom, practice, or failure to hire theory.

**V.   CONCLUSION**

For the foregoing reasons, Count I of Plaintiffs' Amended Complaint is dismissed as to Defendants Carney and LaCombe, and Count II of Plaintiffs' Amended Complaint is dismissed in full. An appropriate Order follows.